UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

RYAN FORD LOWE,

        Debtor.

_____/

Case No. HL 07-02629
Chapter 7

JOHN OWENS,

        Plaintiff,

v.

RYAN FORD LOWE,

        Defendant.

_____/

Adversary Proceeding
No. 07-80348

FIRST STATE BANK OF MIDDLEBURY,

        Plaintiff,

v.

RYAN FORD LOWE,

        Defendant.

_____/

Adversary Proceeding
No. 07-80349

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.     Introduction and Jurisdiction

These two adversary proceedings arise out of a common set of facts surrounding

the sale of an Indiana courier service to the Debtor, Ryan Ford Lowe ("Lowe" or

"Defendant"), and the financing of that transaction through the Plaintiffs, John Owens

("Owens") and the First State Bank of Middlebury (the "Bank" and with Owens collectively referred to as the "Plaintiffs"). Originally, each plaintiff filed separate adversary proceedings, but because both cases involve common issues of fact and law, the parties requested consolidation at a Pre-Trial Hearing held on October 18, 2007. I issued an Order to Consolidate Adversary Proceedings on October 30, 2007, and held a two-day trial on December 11, 2008 in Lansing and December 16, 2008 in Grand Rapids.

The Plaintiffs seek judgment barring Lowe's discharge entirely, under 11 U.S.C. § 727, and excepting their respective debts from discharge under 11 U.S.C. § 523(a)(2).

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b), and authority to enter final judgment in this core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.[1]

## II.   Motions in Limine

After several discovery disputes, the parties timely filed Exhibit and Witness Lists, and Proposed Findings of Fact and Conclusions of Law. However, on November 26, 2008, each side filed objections to the other's Exhibit Lists (the "Objections"). On December 1, 2008, I issued an order treating the Objections as motions *in limine*. I required that the Defendant establish the authenticity of certain exhibits; I preserved the parties' hearsay and other objections for trial; and I scheduled argument to take place immediately before trial to give the Defendant an opportunity to argue that he either

---

[1] Federal Rule of Bankruptcy Procedure 7052 makes Federal Rule of Civil Procedure 52 applicable to these adversary proceedings.

produced certain exhibits during discovery, or that his failure to do so was substantially justified or harmless. I also invited argument regarding the Defendant's reliance on Fed. R. Evid. 408 to exclude the Plaintiffs' Exhibit 2 -- the Defendant's December 2006 Personal Balance Sheet.

On December 5, 2008, the Defendant filed another Motion *in Limine* to Exclude Evidence and Testimony Re: Claims Not Identified in Response to Discovery ("Motion *in Limine*"), contending that the Plaintiffs intended to present evidence of alleged misrepresentations not identified in their discovery responses. I likewise set this hearing to commence immediately before trial on December 11, 2008, in Lansing, Michigan.

On the morning of trial, I denied the Motion *in Limine* because the Defendant's reliance on Fed. R. Evid. 408(a)(2) was misplaced. As the commentary to Fed. R. Evid. 408(a)(2) explains, the rule "cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations." Fed. R. Evid. 408, Official Commentary to 2006 Amendment. Consequently, I found the Defendant's December 2006 Personal Financial Statement to be admissible because it was comprised of pre-existing information concerning the Defendant's financial affairs, and was otherwise discoverable. I was unwilling to exclude the information merely because Defendant shared it in the course of compromise negotiations in earlier state court litigation.

I also denied the Defendant's Motion *in Limine* to the extent it took issue with Plaintiffs' proposed use of a document the Defendant himself had produced. Given the document's origin, I failed to see the prejudice. The parties resolved the other

Objections to the Exhibit Lists either before or during trial, for example, by agreeing that the court should admit specific documents without considering handwritten interlineations of uncertain origin.

### III.   Background and Issues

Lowe and Owens first met at a marina in Saugatuck, Michigan, and shared a common interest in yachts and maritime leisure. As their friendship grew, the two men spent time on each other's boats, at each other's homes, and met each other's families. According to Owens, Lowe had a winning personality and a lot of ambition, and Owens began to see Lowe as a younger version of himself. Throughout this time, Owens owned a courier business called Ye Olde Speedy Deliveries, Inc. ("Speedy Deliveries"). He had owned it for several years, and although the business was prosperous at the time, Owens had grown tired of operating it. He expressed an interest in selling the business and asked Lowe, a certified public accountant and by then a trusted friend, to look at the books. Shortly thereafter, Owens decided to put the business on the market.

Lowe expressed an interest in purchasing Speedy Deliveries, but told Owens he needed time to put some financing together. Throughout their acquaintance, Lowe had told Owens he was the owner of his own business, which I will refer to as "Simplified Accounting." During the time they were negotiating the sale, Lowe claimed that Simplified Accounting was growing and he had cleared $250,000 just that year. Lowe also represented to Owens that he owned a 40 foot sailboat, rental properties and property management companies.   From all appearances, Lowe seemed like a

prosperous young professional making the most of his natural gifts, education, and license as a CPA.

Even though Owens had a cash offer of $1.75 million for the courier business from another company, he decided to sell the business to Lowe because of their friendship and what he believed to be Lowe's healthy financial prospects. In addition, to make it possible for Lowe to purchase the business and give him the time he needed to pay for it, Owens agreed to accept a promissory note from Lowe, essentially providing seller-financing for part of the purchase price. He also offered to put Lowe in touch with the Bank to arrange financing for the balance.

Owens, the older of the two principal parties to this dispute, had been doing business with the Bank for several years as both a customer and courier service vendor. Apparently in a state of symbiosis, the Bank met Owens's financing needs, and used his courier service for its deliveries.  Each was a long-standing customer of the other.  As a result, the Bank was very familiar with the financial condition and credit worthiness of Owens and Speedy Deliveries.

The parties began to arrange financing in December 2004, when Lowe met with the Bank's commercial loan officer, Mark Carboneau ("Carboneau"), upon whom Owens had relied as his banker for many years. Lowe submitted a Personal Balance Sheet ("PBS") regarding his personal assets and liabilities, and other financial statements for his companies, including bank account statements. Later, on or about April 14, 2005, Lowe prepared a Profit and Loss Statement ("PLS") for the period of May 1, 2004 through April 14, 2005 showing that the engine of Lowe's empire – Simplified

Accounting – had a net income of $172,511.75. Evidently, Simplified Accounting's fiscal year ran from May 1 to April 30, so the PLS covered most, but not all, of the annual accounting period. Lowe transmitted the PLS to the Bank by mailing it to Carboneau on April 14, 2005. Sometime during the loan approval process, Owens met with Carbonaeu and asked if everything Lowe had told Owens regarding his financial situation was true. Carbonaeu confirmed that it was. On July 1, 2005, after approval by its loan committee, the Bank agreed to lend Lowe $340,000 toward the purchase of Speedy Deliveries, but required Owens to be a co-obligor on the loan. For the rest of the purchase price, Owens agreed to accept from Lowe a promissory note for $970,000 along with a security interest in certain assets from Lowe. Owens also agreed to enter into a consulting agreement with Speedy Deliveries. The closing took place on June 28, 2005, during which Owens saw Lowe's PBS listing about $1.4 million in assets and $539,500 in liabilities.

Furthermore, on September 1, 2005, in reliance on the same financial statements Lowe provided at or before the closing, the Bank loaned Simplified Accounting an additional $200,000.

Lowe made payments to both Owens and the Bank pursuant to their agreements until the Fall of 2006. At that point his relationship with Owens had soured and Lowe stopped paying Owens, though he continued to pay the Bank for several months thereafter. Lowe filed a voluntary Chapter 7 bankruptcy petition on April 11, 2007.

Owens filed an adversary proceeding on July 27, 2007 asking the court to except Lowe's debt from discharge under 11 U.S.C. § 523(a)(2), and also to deny Lowe a

general bankruptcy discharge under 11 U.S.C. § 727(a)(2)(A), (a)(4)(A), and (a)(5). The Bank filed a similar complaint on July 29, 2007 based upon the same set of facts.

Both Owens and the Bank allege that Lowe falsified financial statements and made several misrepresentations to induce them to provide financing for his purchase of the courier business and the operations of Simplified Accounting. They allege that throughout the sale negotiations, Lowe stated his assets had a fair market value in excess of $1.4 million, while his liabilities were $539,500. Further, among other falsities, Lowe stated his 60% ownership interest in his accounting business had a fair market value of $660,000 with only $210,000 in liabilities. Yet in May 2005, one month after submitting the financial statement to the Bank, Lowe sold 40% of his ownership interest for $125,000. By the time Lowe filed bankruptcy, he listed the net value of his share of Simplified Accounting as $18,000.

At trial, Owens and the Bank appeared to narrow their non-dischargeability claim down to 11 U.S.C. § 523(a)(2)(B), premising their request for relief on Lowe's written misrepresentations regarding his financial condition and the financial condition of the accounting firm which Lowe then owned through Lowe & Company, a holding company. Their case hinges specifically on the PBS that Lowe provided to the Bank in December 2004 (Plaintiffs' Exh.1), and the partial year PLS for his business, (Plaintiffs' Exh. 2).

Lowe denied making any misrepresentations regarding his personal or business financial condition. He also asserted that the Bank did not reasonably rely upon any financial statements he made because it was relying on Owens's financial condition when it made the loan. Lowe further argues that Owens never received any financial

statements from him and thus could not have relied upon them. At trial, Lowe attempted to discredit the Bank's case by suggesting that the Bank had shared the PBS with Owens, without Lowe's permission, in derogation of Lowe's privacy expectations.

IV.    Analysis

a.    11 U.S.C. § 523(a)(2)(B) – Dischargeability of Debt

From the panoply of possible statutory grounds to except a debt from discharge, at trial the Plaintiffs apparently settled on 11 U.S.C. § 523(a)(2)(B), arguing that Lowe induced them to part with the loan proceeds by misrepresenting in writing his financial condition and the financial condition of insiders, including Simplified Accounting. Distilled to essentials, the controlling provision, 11 U.S.C. § 523(a)(2)(B), states in pertinent part:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
>
> > (2) for money, property, services, or an extension renewal, or refinancing of credit, to the extent obtained by –
> >
> > > (B) use of a statement in writing –
> > >
> > > > (i) that is materially false;
> > > >
> > > > (ii) respecting the debtor's or an insider's financial condition;

8

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

There is no dispute that Lowe furnished the Bank with a statement in writing respecting his financial condition. In dispute is whether the statement was materially false; whether the Bank reasonably relied upon it; and whether Lowe caused it to be published with an intent to deceive. As to Owens, Lowe disputes he ever made a statement in writing.

In his PBS signed at the closing June 28, 2005, but provided to the Bank in December 2004, Lowe listed several assets including a 50% ownership interest in a Florida condominium worth $162,500. This property, however, was actually owned in full by Lowe's childhood friend, Rodney Allen White ("White"). Although White claimed he and Lowe had an oral agreement that Lowe would pay for repairs, Lowe was never in the chain of title, nor was he reimbursed from the sale proceeds of the condominium. White claims to have refinanced the condominium, paying Lowe his "equity" prior to the sale. The Plaintiffs established by a preponderance of the evidence that Lowe did not own the condominium as he represented. As a CPA, Lowe knew or should have known that the PBS did not accurately reflect his interest in the condominium, and was likely to paint a deceptively rosy picture of assets that, if called upon to satisfy the Plaintiffs' claims, would yield nothing.

Lowe's PBS also listed a 50% ownership interest worth $80,000 in rental property located at 660 Washington in Owosso, Michigan. Lowe testified that his mother transferred this property to him for "estate planning" purposes. He proceeded to mortgage the property for $100,000 and transfer it back to his mother, thereby parting with his ownership interest. Nonetheless, on the PBS, he claimed to own 50% of the property. On the liability side, he represented he owed only 50% of the mortgage debt or $47,500. So when the smoked cleared, he over-stated his ownership interest and under-stated his liability for the mortgage payment. One wonders whether the supposed "estate planning" involved his mother's nascent probate estate or, given the wheeling and dealing described at trial, his own possible bankruptcy estate.

Further, by uttering the PBS, Lowe claimed ownership in a 36 foot Catalina sailboat allegedly worth $50,000. In fact Lowe hadn't formally taken steps to title the boat in his name. He explained that when he "purchased" the boat, the registration wasn't due for two more years. If he transferred title at the time of purchase, he would have been required to pay transfer taxes and registration fees immediately. Instead he simply put the title in his safe. He testified that he sold the boat in February 2006 for $35,000. (See also Pl. Exh. 66). So, Lowe failed to take steps to perfect his title in order to defeat the transfer tax and registration fees, yet claimed the benefits of full title for other purposes, including to induce the Plaintiffs to part with the loan proceeds. Again, I infer that Lowe, as a CPA, knew better and knew that Plaintiffs would assume perfect title in the boat. Moreover, it is hardly a fitting defense to charges that he misrepresented his ownership in the boat to explain the misrepresentation by claiming it was necessary to cheat the Michigan treasury.

Next, Lowe disclosed a 60% ownership interest in Simplified Accounting worth $660,000. However, before closing, Lowe sold 40% of the business to Nikali Luke ("Luke") for $125,000. Lowe explained this discrepancy by saying that he and Luke had an agreement regarding the purchase price that involved a lower value in contemplation of Luke's divorce or upon either party's bankruptcy. He used a higher valuation method when determining the value of his interest on the PBS.  Luke later purchased Lowe's remaining interest in the business for $18,000 from the bankruptcy trustee.

In summary, on June 28, 2005 through his PBS, Lowe verified to the Plaintiffs at the closing that he had over $1.4 million in assets and $539,500 in liabilities for a net worth of approximately $863,000. By December 2006, he provided the Plaintiffs' with an updated Personal Balance Sheet which reported total assets of $686,000, total liabilities of $1,630,430 and a net worth of negative $944,430. As for the PLS for the 11 ½ month period of May 1, 2004 to April 14, 2005, which showed a profit of $172,511.75, a completed PLS for the entire year was admitted as Plaintiff's Exhibit 22 ("PLS2"). When the remaining two weeks of Simplified Accounting's fiscal year were included in the calculations of the PLS2, the $172,511.75 profit became a net loss of $43,833.33. Lowe explained the gaping difference between these two outcomes as adjustments for depreciation, goodwill and management fees paid to his holding company. This left Simplified Accounting with a negative cash flow and a loss, instead of the gain he reported to the Bank.

The plaintiff who seeks to except a debt from discharge under § 523(a)(2)(B) must satisfy all the elements of the statute by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 286 (1991). A plaintiff's failure to prove any one of the

11

elements contained in § 523(a)(2)(B) will result in a dismissal of the dischargeability complaint. In re Prestridge, 45 B.R. 681, 683 (Bankr.W.D.Tenn.1985). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. Gleason v. Thaw, 236 U.S. 558 (1915); Grogan, 498 U.S. at 285; see also In re Hayes, 235 B.R. 885, 891 (Bankr.W.D.Tenn.1999).

First, I find that Lowe provided Owens with a written statement, in the form of the PBS, at the closing. Lowe was aware that the PBS was included in the closing documents, and in fact signed it in front of Owens. In order for a statement to be in writing, it must either be written by the debtor, signed by the debtor, or adopted and used by the debtor. In re Whitehouse, 26 B.R. 239, 242 (Bankr. W.D. Ky. 1982). Here, we have all three. Had the PBS not comported with the picture Lowe had given Owens regarding his financial well-being, it was not too late for Owens to change his mind. Owens, unlike the Bank, was not required to persuade a loan committee or think about the best interests of stockholders when advancing the loan. He was only responsible for making up his own mind. Consequently, had Lowe presented him with the true figures of his financial condition, Owens could have walked away at any time up until the conclusion of the closing. Therefore, the first element of § 523(a)(2)(B), that there must be a statement in writing, has been met as to both Plaintiffs.

"A financial statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." In re Michael, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001); see also First National Bank v. Sansom (In re Sansom), 224 B.R. 49, 54 (Bankr. M.D. Tenn. 1998); Haney v. Copeland (In re Copeland), 291 B.R. 740 (Bankr. E.D. Tenn.

2003). Material falsity has been defined as "an important or substantial untruth." Fleming Companies v. Eckert (In re Eckert), 221 B.R. 40, 44 (Bankr. S.D. Fla. 1998); Southwest Financial Bank & Trust Company of Orlando Park v. Stratton (In re Stratton), 140 B.R. 720, 722 (Bankr. N.D. Ill. 1992). In addressing material falsity, courts examine whether the lender would have made the loan had it known of the debtor's true financial condition. Wolfe v. Tri-State Insurance Co., 407 F.2d 16, 19 (10th Cir. 1969); In re Barnacle, 44 B.R. 50, 54 (Bankr. D. Minn. 1984); In re Winfree, 34 B.R. 879, 884 (Bankr. M.D. Tenn. 1983).

Further, 11 U.S.C. § 523(a)(2)(B)(ii) requires that the writing presented to a creditor makes representations regarding either the debtor's or an insider's financial status. Such documents include balance sheets, income statements, statements of changes in financial position, or income and debt statements that provide what may be described as the debtor's net worth, overall financial health, or equations of assets and liabilities. Skull Valley Band of Goshute Indians v. Chivers (In re Chivers), 275 B.R. 606, 615 (Bankr. D. Utah 2002); Armbrustmacher v. Redburn (In re Redburn), 202 B.R. 917, 927-28 (Bankr. W.D. Mich. 1996).

I find the PBS that Lowe provided to the Plaintiffs and the PLS he provided to the Bank, neither of which he changed or updated at closing, constitute financial statements within the meaning of § 523(a)(2)(B)(ii), and were gross misrepresentations of Lowe's financial affairs pursuant to § 523(a)(2)(B)(i). As a CPA, Lowe especially knew or should have known that his inflated numbers and ownership interests were false or at the very least drew a materially misleading picture. Therefore, I find the Plaintiffs have proven

13

that Lowe made materially false statements in writing respecting his financial condition and the financial condition of his companies pursuant to §523(a)(2)(B)(i) and (ii).

The reliance element of § 523(a)(2)(B)(iii) has two components: actual reliance and reasonable reliance. See In re Woolum, 979 F.2d 71 (6th Cir. 1992), cert. denied, 507 U.S. 1005 (1993). Reasonableness operates to bar a discharge only where the creditor's reliance was so unreasonable as to negate the existence of actual reliance. A determination of reasonableness must consider all the facts and circumstances of the case, including the size of the loan. Boston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir. 1992); Phillips v. Coman (In re Phillips), 804 F.2d 930, 933 (6th Cir. 1986); Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166 (6th Cir. 1985).  The reasonableness requirement of § 523(a)(2)(B)(iii) "cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." Martin, 761 F.2d at 1166; see also Bomis v. National Union Fire Insurance Co., 25 F.3d 1047 (6th Cir. 1994) (the statute is directed at creditors who never actually examined the financial statements, as well as those who purposely solicit false financial information).

Initially, I find absolutely no evidence, nor has it been formally alleged, that the Bank acted in bad faith. I find the Plaintiffs' actual reliance on Lowe's PBS and PLS was reasonable. Carboneau testified that, in the ordinary course of its business, the Bank required no application for a loan in the amount that Lowe sought and obtained. Instead, the Bank collects financial data, evaluates the data, and makes a determination. It also requires tax returns, financial statements and personal financial statements. Carboneau testified, credibly, that he considers CPA-prepared documents to form part of a reliable basis for extending credit.  Lowe provided his personal tax returns, the PBS and the

14

PLS. The Bank received Lowe's PBS in December 2004, and his PLS by mid-April of 2005. This was positive enough financial data for Carboneau to generate a loan approval memo ("Loan Approval Memo") and get approval from the loan committee, according to the Bank's usual practice. The approval came on May 13, 2005, but Carboneau credibly explained that the Bank was not committed at that point to extend credit. Indeed, I believe Carboneau when he testified that if Lowe had shown a net loss on the PLS, his application would have stopped at Carboneau's desk.

For his part, Owens relied on the Bank's investigation and the documents reaffirmed by Lowe's signature at the closing. The size of the loan was not extraordinary, especially considering all the personal guarantees, purported collateral, and Lowe's misrepresentations of income and net worth.   Nor were there any "red flags," most likely because Lowe, as a CPA, knew how to compile a believable PBS and PLS.  Moreover, Lowe also knew that because he was a CPA, the Lenders would most likely perceive his own valuation of his assets and liabilities as more accurate than self-valuations by other borrowers.  He acknowledged this, perhaps unwittingly, when he testified that some people prefer to have a CPA sign their tax documents because it lends them credibility. In fact, Carboneau stated that he believed Lowe's status as a CPA made the Bank's reliance more reasonable.

Although the Bank relied heavily on Owens's credit history and his collateral, as well as the existing Speedy Deliveries collateral, I credit Carboneau's testimony that the Bank would not have even considered making a loan to a borrower with negative net income.  In turn, it was reasonable for Owens to rely on Lowe's statements at the closing, since it was certainly foreseeable for him to do so under the circumstances.

Indeed, a principle purpose of closing is to permit the parties to consider one last time the information on which their transaction depends.

I do not credit Lowe's suggestion that the Plaintiffs should have asked for an updated PLS or PBS prior to closing. It was incumbent upon Lowe to alert the Bank and Owens to his changed circumstances, if indeed they had really changed, or at least not to induce the lenders to rely on a PLS and PBS that, at the crucial moment of closing, Lowe knew was misleading. See First Commercial Bank v. Robinson (In re Robinson), 192 B.R. 569, 577 (Bankr. N.D. Ala. 1996), quoting Martin, 761 F.2d at 1167 (debtor's reaffirmation to the lender that his financial condition had not changed since the date of the earlier financial statement brought the aged financial statement current, curing any staleness). Under the circumstances, I find the Plaintiffs have met their respective burdens of proof under 11 U.S.C. § 523(a)(2)(B)(iii).

In the Sixth Circuit, "intent" within the meaning of 11 U.S.C. § 523(a)(2)(B)(iv) includes actual intent to deceive as well as gross recklessness. Martin, 761 F.2d at 1167; Knoxville Teachers Credit Union v. Parkey (In re Parkey), 790 F.2d 490 (6th Cir. 1986) (requiring proof that statement was either knowingly false or made so recklessly as to warrant a finding that the Debtor acted fraudulently). A determination of intent to deceive focuses on circumstantial evidence and is generally inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor, indicating intent to deceive or cheat the creditor. John Deere Co. v. Myers (In re Myers), 124 B.R. 735 (Bankr. S.D. Ohio 1991).

16

The documents provided by Lowe were prepared solely by him. He signed them at the closing as required. As a licensed accountant, and knowing acceptable accounting practices, Lowe understood that his financial statements were false or at the very least misleading. For example, Lowe testified that he listed a 50% ownership interest in the Florida condominium worth $162,500 on his PBS even though he never took title. He said he did this because he had a six month window during which he held some kind of option to purchase – an option he never exercised.  Nevertheless, on the PBS he claimed to have an ownership interest. An option to purchase, if indeed there were one, is not an ownership interest, and a CPA would have perceived the distinction. Likewise, he sold 40% of his business interest in Simplified Accounting, before giving the Bank his PBS, but listed a 60% interest worth an inflated amount, knowing he just sold a portion for far less.  I understand that the disparity in values may, to some extent, reflect a control premium, but taken with the other evidence testimonial and documentary, I infer that Lowe was not forthcoming and in fact overstated the value of his enterprise. Similarly, he gave the Bank his PLS just prior to doing his end of the year adjustments, knowing the company would appear more valuable at that time, since the PLS did not reflect inevitable downward adjustments bearing on the bottom-line.  All of these items, along with the other concealment, omissions and legerdemain, show that Lowe used his knowledge of accounting and his license as a CPA to deceive Owens and the Bank. Therefore, I find the Plaintiffs have met their burden to prove the intent element under 11 U.S.C. § 523(a)(2)(B)(iv) specifically, and the non-dischargeability of their debts in full pursuant to 11 U.S.C. § 523(a)(2)(B), more generally.

At trial, each Plaintiff produced documentary and testimonial evidence of the amount of their respective debts. Owens contended, without meaningful contradiction, that Lowe owes him $1,314,000.00, and pointed to Plaintiffs' Exhibit 9, to show a promissory note in the amount of $970,000.00. The testimony included debt attributable to Owens's post-sale consulting agreement with Speedy Deliveries. The statute refers to obtaining goods, money, and services by fraud, and I believe the debts under the note and consulting agreement both qualify. Accordingly, I find (and the judgment will provide) that Lowe owes Owens a non-dischargeable debt in the amount of $1,314,000.00 plus interest.

For its part, the Bank's evidence, admitted primarily through Carboneau, established that Lowe owed the Bank $497,796.03 as of November 18, 2008, under the two Bank loans (Pl. Exh. 4 and 6). Because Lowe's misleading financial statements induced the Bank to part with the loan proceeds, and because the preponderance of the evidence establishes that this amount represents the unpaid balance on the Bank's loans, the judgment will award this amount, plus interest, as a non-dischargeable debt in the Bank's favor.

### b. 11 U.S.C. § 727 – Denial of Discharge

In addition to seeking a specific exception to discharge for their respective debts, the Plaintiffs sought through this proceeding to deprive the Defendant of a discharge generally, under 11 U.S.C. § 727(a). I am not persuaded, by a preponderance of the evidence, that the Plaintiffs have met their burden. Most of the transactions described at trial took place outside the one-year look back period prescribed in 11 U.S.C. § 727(a).

18

Nor did Plaintiffs present a compelling case under the other statutory subsections for objecting to discharge.

Of the several subsections warranting denial of discharge, the Plaintiffs initially invoked three. So far as relevant to this proceeding and the Plaintiffs' allegations, Section 727(a) provides as follows:

(a) The court shall grant the debtor a discharge, unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor . . .has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the date of the filing of the petition;

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . .

11 U.S.C. § 727(a). The Sixth Circuit Bankruptcy Appellate Panel has adopted the test set forth in Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996), saying "it provides a convenient framework for analyzing an action to deny the Debtor's discharge under § 727(a)(2)(A) and is not in conflict with Sixth Circuit law." Buckeye Retirement Co., LLC v. Swegan (In re Swegan), 383 B.R. 646 (6th Cir. BAP 2008). The Craig test requires that: (1) the Debtor conceal assets within one year of the petition date; (2) the act of concealment be performed by the Debtor; (3) the act consist of a transfer, removal, destruction or concealment of the Debtor's property; and (4) the act be done with the intent to hinder, delay and/or defraud either a creditor or officer of the Debtor's estate.

The Plaintiffs' strongest claim for denial of discharge derives from Section 727(a)(2) and Plaintiffs' challenge to certain prepetition transfers of Lowe's property or property he may have controlled through his holding company. From the testimony and the exhibits admitted at trial, however, it appears that only one transfer took place within a year of Lowe's bankruptcy filing on April 11, 2007. For example, Lowe transferred the 660 Washington property in 2004, and sold the boat in February 2006. He transferred 40% of his ownership interest in Simplified Accounting in May 2005. There was also testimony and an exhibit regarding a $10,000 Christmas gift or loan to a family friend, Mike Fellabaum, but the documentary evidence of this transfer – a check -- was dated December 25, 2005 – outside the one year period.

The only allegedly fraudulent conveyance that came within the one year time period of Section 727(a)(2)(A)  involved real property at 310 Beaver Street  in Lansing, Michigan (the "Beaver Street Transfer"). Lowe testified that his father transferred

$45,000 of the $50,000 down payment toward the purchase price.  He also testified that in December 2006, Lowe transferred the property back to his father for $15,000, and the forgiveness of the down payment "loan." This transfer took place within the same time period in which Lowe had begun to default on the loans from the Bank and Owens.

Because a debtor rarely stands up and admits that he intended to defraud his creditors, courts have developed indicia of improper intent called "badges of fraud," a familiar concept in fraudulent conveyance law. The factors that courts consider as indicators of fraudulent intent include, but are not limited to, whether:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was disclosed or concealed;

(4) before the transfer was made, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Taunt v. Wojtala (In re Wojtala), 113 B.R. 332 (Bankr. E.D. Mich. 1990); In re Peters, 106 B.R. 1 (Bankr. D. Mass. 1989); In re Brooks, 58 B.R. 462 (Bankr. W.D. Pa. 1986).

The Beaver Street Transfer was to Lowe's father, an insider. Lowe knew he had defaulted or was about to default on his promissory note to Owens, and that the default would likely prompt a lawsuit or lawsuits. With respect to the value of the consideration received, however, the record is not adequate to make a finding for the Plaintiffs. It seems reasonable to assume that Lowe's equity in the Beaver Street property was limited by the unpaid balance on the purchase money financing, and that his father took the property subject to the purchase money lender's interests. It is also conceivable that his father's alleged forgiveness of debt constitutes value for fraudulent transfer purposes. If so, the $45,000 loan and forgiveness is a wash, so Lowe's father arguably transferred $15,000 to Lowe in exchange for Lowe's $5,000 equity stake in the Beaver Street property. On the present record, therefore, I am not willing to make a finding regarding the values exchanged. I must keep in mind, first, that the Plaintiffs have the burden of proof, and second, that the other questionable transfers occurred outside the one-year period. It is tempting to consider them in evaluating the Plaintiffs' right to

relief under Section 727(a), but I am mindful of the seriousness of denying the discharge generally, and the precise formula set forth in Section 727, which limits the issues for consideration.   I am left with factual support in the record for finding two badges of fraud: transfer to an insider while litigation is imminent.

Although I may have the discretion to deny the discharge upon this relatively slim reed, I am not persuaded that the evidence preponderates in Plaintiffs' favor on this count, particularly where proof is lacking on the values exchanged – an important badge of fraud.

As for the "false oath" count premised on Lowe's schedules, I am similarly unwilling to grant relief.  In fact, it appears to me that Lowe, or more likely his counsel, provided considerable detail and disclosure of Lowe's convoluted financial situation through the schedules.  I commend Lowe's counsel, under the circumstances.

Finally, the Plaintiffs appeared to abandon the § 727(a)(5) count at trial.  In any event, I do not believe there is a preponderance of the evidence in Plaintiffs' favor regarding the "failure to explain loss of assets" count.

V.    Relief

The evidence at trial depicted Lowe as an ambitious young man willing to take risks, willing to play fast and loose with facts, a man not ashamed to offer merely colorable *post hoc* explanations for questionable business practices.  He was willing to exploit false financial statements, his CPA's license, and his friend's good credit with the Bank, to entice his friend and the Bank to part with their money or services.   In retrospect, I am certain that the Plaintiffs regret not making a more thorough inquiry into Lowe and his companies, but their underwriting decisions were meaningfully and

23

reasonably premised on the written statements that Lowe made concerning his financial condition and the condition of his companies.  This is enough to justify relief under 11 U.S.C. § 523(a)(2)(B).  And, while I would hardly place Lowe among the ranks of the many "honest but unfortunate" debtors who appear before me, the Plaintiffs' case does not warrant relief under 11 U.S.C. § 727(a) for the reasons I have given.

Although I consolidated these adversary proceedings for trial under Fed. R. Civ. P. 42(a), I hereby direct the clerk to enter separate judgments in favor of each Plaintiff in the docket of each adversary proceeding, consistent with these findings of fact and conclusions of law.

IT IS SO ORDERED.

Date: January 27, 2009

Scott W. Dales
United States Bankruptcy Judge